## THE HENRY R. TILTON.

### (District Court, D. Massachusetts. October 31, 1913.)

### No. 720.

1. SALVAGE (§ 28*)—AMOUNT OF AWARD—DAMAGES—DERELICT.

   A fishing vessel, which took charge of an abandoned derelict loaded with lumber, at sea where she was a menace to navigation, and towed her into port, the service requiring 28 hours in winter weather with the men who were placed on board exposed to the seas which washed over the derelict, *held* entitled to an award of $1,250 and expenses incurred; the salved value being appraised at $3,500, and the value of the salving vessel about $70,000.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 69, 71; Dec. Dig. § 28.*]

2. SALVAGE (§ 52*)—ACTION—COSTS.

   Salvors of a derelict do not lose their right to costs because they filed a libel at once and turned the vessel over to the marshal without attempting to ascertain the owners or negotiating with the insurers of the cargo as requested.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 135–137; Dec. Dig. § 52.*]

In Admiralty. Suit for salvage by the Bay State Fishing Company against the schooner Henry R. Tilton and cargo. Decree for libelants.

Currier, Rollins, Young & Pillsbury, of Boston, Mass., for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for claimant.

MORTON, District Judge. This is a libel for salvage by the owner and crew of the steam trawler, Swell, to recover salvage compensation for services rendered the three-masted schooner, Henry R. Tilton.

[1] The facts are as follows: On Sunday, December 22, 1912, the Swell was proceeding from the fishing banks off Cape Cod, toward Boston, with a cargo of fish. Early in the afternoon, when about 85 miles southeast of the north point of Cape Cod, she came across the Henry R. Tilton, a water-logged derelict, abandoned by her crew. The Tilton was laden with lumber and would probably have floated for an indefinite time. She was in or near a region much traversed by vessels of all kinds and was likely to become a dangerous menace to navigation. Part of the deck load of lumber had probably been washed overboard, and the forward part of it had been thrown aft by the sea; the underdeck load had, to some extent, loosened, and had battered out bulkheads and knocked a hole in the stern through which water poured

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in and out. A fairly heavy sea seems to have been running, but nothing at all unusual; and the weather was fair.

A boat's crew from the Swell, consisting of five men, went aboard the Tilton, and, after working for an hour or an hour and a half, succeeded in fastening a wire towing hawser to the Tilton's bow. This work was attended with a good deal of discomfort and perhaps some danger, because the schooner, besides being low in the water, was somewhat down by the head, and the sea washed over where the men were fastening the hawser on. About 3 o'clock that afternoon, the Swell started to tow the Tilton toward Boston. It looked as if the single hawser would not stand the strain; the towing was suspended, and a second similar hawser was run. The Tilton's steering gear had been broken; but temporary repairs were made with no great difficulty. Part of the Swell's crew, usually numbering five, was kept on the Tilton until late in Sunday night. They were relieved about every five hours. The seas occasionally washed over the Tilton amidships and frequently came aboard forward. As she was full of water, there was no shelter for the crew. It was undoubtedly exposing and disagreeable work, but seems to have had no serious element of danger in it, except such as might arise from the exposure. The temperature was below freezing, but not unusually cold for the time of year.

The total crew of the Swell numbered 19, comprising 12 deck hands, 2 engineers, 2 firemen, 1 cook, a first officer, and a captain. Of course, keeping four or five men on the Tilton greatly increased the work of the Swell's crew.

Early Monday morning the wind freshened to a strong breeze, which lasted all day Monday and rendered it unsafe to keep men on the Tilton. All men were taken off the Tilton early Monday morning and remained off until Monday night, when, the weather having moderated, a crew of five from the Swell again went on board the Tilton. During Monday little progress was made toward port, the Swell doing little more than hold onto the Tilton; but to do so, while requiring courage and skill, seems not to have been unusually difficult or dangerous. Four or five men were kept on board the Tilton from Monday evening until Boston Harbor was reached about 8 o'clock Tuesday morning.

After being brought into Boston Harbor, the Tilton was first anchored and was later towed to a wharf. The Swell discharged her cargo of fish, valued at about $2,600, Tuesday morning about 9 o'clock. The value of the Swell was in the neighborhood of $70,000. The Swell was delayed by the salvage work about 28 hours, and burned in that time about 14 tons of coal, costing about $60. The following payments were made on account of the Tilton, viz.:

| | |
|---|---:|
| Towage | $15 00 |
| Watchmen | 10 00 |
| Wharfage | 53 25 |
| Custom house fees | 5 50 |
| Labor | 11 50 |
| | $95 25 |

Notice was given by the insurers of the cargo at the office of the Bay State Fishing Company, about 9 o'clock Tuesday morning, that

they were interested in the matter and wished to be communicated with in reference to settling the claim for salvage. This was before the libel was filed. Later that same day, without any effort to confer with the insurers, as owners of the cargo, a libel was filed against the Tilton for salvage, and the marshal took charge of her. Nobody representing the owners of the Tilton communicated with the libelant until about January 2d. In the meantime, after the filing of the libel, there had been conferences between counsel representing the underwriters on the cargo and counsel for the libelant, in reference to an agreement on the value of the Tilton. The parties were unable to agree, and an appraisal was had at an expense of $81. The appraiser valued the Tilton at $500 and her cargo at $3,000, which sums counsel for the owners of the cargo had expressed a willingness to agree to before the appraisal was made.

The questions argued are: First, as to the amount of salvage; second, whether the salvors should pay the cost of appraisal; third, whether the salvors, by failing to communicate with the owners of the cargo and to settle the salvage out of court, had disentitled themselves to costs on the libel.

As to the amount of salvage, the respondents offer by their answer $1,100. I think this would be enough but for the fact that the Tilton, if not towed in or destroyed, was likely to become a source of great danger to other vessels. I agree entirely with what was said by Judge Benedict in The Anna, 6 Ben. 166, Fed. Cas. No. 398:

"For the taking in charge and saving of a wreck so situated, the reward should be such as to insure at all times the rendering of any amount of labor, the incurring of any risk, and the deviation of any vessel from any voyage in order to supply the wreck with a crew, and make her presence safe."

See, too, The Agnes Manning (D. C.) 59 Fed. 481; The Theta (D. C.) 135 Fed. 129; The Myrtle Tunnel (D. C.) 146 Fed. 324. These cases so closely resemble the one at bar that no further discussion of the principles on which the award should be made is necessary. The suggestion in The Agnes Manning, supra, that prior awards had apparently been on too low a basis to secure the service desired, deserves consideration. At the same time, the moiety which the libelants contend for, amounting to $1,750, seems an excessive reward, considering the services rendered to the owners and to the public, the time occupied, and the amount of property involved. Under all the circumstances, I think that the libelants are entitled to $1,250 as salvage, and to expenses amounting to $155.25; and I so find.

[2] As to costs: An appraisal is required in salvage cases by rule of this court passed March 13, 1867, unless the parties agree upon value. The libelants were wrong in their estimate of value, but I do not find that they were unreasonable in believing that the Tilton and her cargo were worth more than the sum found by the appraiser, and in insisting on their right to an appraisal. This item is to be included in the costs.

It is said that the libelants acted so unfairly and oppressively in bringing this libel without first attempting to arrive at an agreement as to the amount of salvage with the owners of the cargo that costs

ought not to be awarded on the libel. The owners of the Tilton were not represented in Boston and did not communicate with the salvors for more than a week after the Tilton was brought in. The salvors knew, or could easily have discovered, who the owners were, but made no effort to look them up or communicate with them. The insurers or owners of the cargo made no offer before the libel was filed; the offer made by them in their answer I regard as inadequate. There is no claim that they would have offered more before the libel was filed. Somebody had to undertake at once the responsibility for and the care of the Tilton. I do not think that it was incumbent upon the salvors of the derelict to hunt up the owners, nor that the libelants, in bringing this libel and having the marshal take charge of the Tilton, before discussing the question of salvage with the insurers of the cargo, acted unreasonably or oppressively. The libelants may take the usual costs. I am not asked to apportion the award among the different persons entitled to share in it; if necessary, a reference may be had as to such apportionment.

Decree for libelants for salvage amounting to $1,250, expenses amounting to $155.25, and costs including the appraisal.