**WESTAR MARINE SERVICES, et al., Plaintiffs,**

v.

**HEEREMA MARINE CONTRACTORS, S.A., et al., Defendants.**

**No. C–84–4998 EFL.**

United States District Court, N.D. California.

Nov. 18, 1985.

Sheldon A. Vogel, Thacher, Proffitt & Wood, New York City, Graydon S. Staring, Lillick McHose & Charles, San Francisco, Cal., for defendants.

Ronald Lovitt, Lovitt & Hannan, Inc., John E. Droeger, Hall, Henry, Oliver & McReavy, San Francisco, Cal., for plaintiffs.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

LYNCH, District Judge.

### I. INTRODUCTION

On the afternoon of July 3, 1984 a number of crafts were fastened together and moored in San Francisco Bay south of the Richmond-San Rafael Bridge. The flotilla consisted of the Heerema Barge H. 109, one or more barges owned by Kaiser Steel Corporation, and a large[1] oil drilling rig owned by Shell California Production, Inc.

At approximately 3:30 p.m. the Heerema Barge dragged her mooring anchor and the flotilla began to drift northward toward the bridge.[2] In response to distress calls, the tug *Polaris* motored to the flotilla and offered assistance. The offer was accepted, and the *Polaris* then maneuvered to attach a towline to the Heerema Barge. Once the towline was affixed, the *Polaris* attempted to position the flotilla so that the strong westerly wind would push the flotilla to shallower waters in the eastern part of the Bay. At approximately 4:15 p.m. the flotilla was grounded upon a rock in the eastern part of the Bay approximately 500 yards south of the bridge.[3] With the assistance of other tugs that had arrived at the scene during the events described above, the *Polaris* towed the flotilla to Anchorage No. 5 in the Bay and was released from further obligations at 6:20 p.m.

The owner, charterer, and two-person crew of the tug *Polaris* have initiated litigation to obtain a salvage award for the acts performed on July 3, 1984. Defendants have brought a motion for partial summary judgment urging this Court to clarify and limit the factors it may consider in making a salvage award. Before such a determination can be made, the Court must decide what law governs this case.

### II. CHOICE OF LAW

Salvage awards are the subject of local,[4] national, and international laws.

---

1. Plaintiffs' amended complaint alleges that the rig weighs approximately 22,000 tons, is 720 feet long, 180 feet high, and 280 feet wide. The size was such that the rig could pass under the Richmond-San Rafael Bridge only at low tide and if partially submerged.

2. Plaintiffs' amended complaint alleges that in light of the danger caused by the threat of the flotilla, the California Highway Patrol closed the Bridge at approximately 4:15 p.m.

3. The Court understands that the question of whether the efforts of the *Polaris* were instrumental in grounding the flotilla or whether the flotilla would have run aground regardless is in dispute and the characterization of the facts presented here in no way resolves that dispute.

4. *See, e.g.,* Cal.Harb. & Nav.Code § 534 (West 1978) (providing that certain persons who rescue a vessel or its cargo from danger are enti-

When this Court sits as an admiralty court, it applies the general federal maritime law. *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 215, 37 S.Ct. 524, 528, 61 L.Ed. 1086 (1917). The Court must determine precisely what constitutes the federal maritime law in this case. Defendants contend that the Court is bound by The Convention for the Unification of Certain Rules of Law Relating to Assistance and Salvage at Sea, Sept. 23, 1910, 37 Stat. 1658 (1913), T.S. No. 576, *reprinted in* 3A M. Norris, *Benedict on Admiralty* App. B–1 (7th ed. 1984), (sometimes referred to as The Brussels Convention of 1910; hereinafter the "Salvage Treaty" or "Treaty"). Plaintiffs argue that the maritime common law of the United States, exclusive of the Salvage Treaty, should be the guide. For the reasons outlined below, this Court is compelled to apply the Salvage Treaty.

■ The Supremacy Clause of the United States Constitution makes clear that along with the Constitution and laws of the United States, "all Treaties ... made ... under the Authority of the United States ... shall be the Supreme Law of the Land." U.S. Const. art VI, cl. 2. Article II explains that a treaty is made under the authority of the United States when it is signed by the President and ratified by two-thirds of the Senate. U.S. Const. art. II, sec. 2, cl. 2. As a result, once a treaty is ratified it is the law of the United States and is as binding as a federal statute. *See In Re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1309 (9th Cir.1982) (upholding the applicability and constitutionality of the Warsaw Convention's limitations on air carrier liability).

The Salvage Treaty was signed by the United States in 1910 at Brussels and was ratified in 1913. 37 Stat. 1658 (1913). Thus, if by its own terms the Salvage Treaty applies to the case before this Court, it must be given effect. *Warshauer v. Lloyd Sabaudo S.A.*, 71 F.2d 146, 148 (2d Cir. 1934) (The Treaty is self-executing; it needs no implementing legislation.). The Court appreciates that the Salvage Treaty "has played little part in the development of American salvage law and has rarely been construed, discussed or cited," G. Gilmore & C. Black, *The Law of Admiralty* 534 (1975),[5] but that historical observation is not a justification for this Court to ignore the Treaty if it is applicable.

The scope of the Salvage Treaty is laid out in its Articles 1, 14, and 15. Article 1 provides that the Treaty will apply to salvage operations, regardless of where they occur, involving seagoing vessels and ves-

---

tled to a reasonable compensation to be paid out of the property saved).

Because subject matter jurisdiction in this case is based on the Court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333 (1982) and not on diversity of citizenship under 28 U.S.C. § 1332 (1982), California law is irrelevant to the resolution of this motion. *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 214–18, 37 S.Ct. 524, 528–30, 61 L.Ed. 1086 (1917). Even if section 534 of the California Harbors and Navigation Code were to apply, the result should be the same as that reached here. "It is now well settled that 'The general rules of the maritime law apply whether the proceeding be instituted in an admiralty or common law court.'" *Intagliata v. Shipowners & Merchants Towboat Co.*, 26 Cal.2d 365, 371, 159 P.2d 1 (1945) (citing, *inter alia, Carlisle Packing Co. v. Sandanger*, 259 U.S. 255, 259, 42 S.Ct. 475, 476, 66 L.Ed. 927 (1921). To the extent California law might be different, the federal maritime law would preempt it. *Cobb Coin, Inc. v. Unidenti-*

*fied, Wrecked & Abandoned Sailing Vessel*, 549 F.Supp. 540, 548 (S.D.Fla.1982).

5. For an example of an omission of reference to the Treaty, see *Sobonis v. Steam Tanker National Defender*, 298 F.Supp. 631, 635 (S.D.N.Y.1969) (allowing a salvage award to Greek seamen on a ship owned by a Greek corporation for salvage assistance rendered to an American-owned ship based not on the law of either of the countries involved, nor on the Salvage Treaty, but relying instead on the *jus gentium* ). *But cf. Caminiti v. Tomlinson Fleet*, 1981 A.M.C. 201, 204 (N.D.Ohio 1979) (The Treaty, as interpreted in *Warshauer v. Lloyd Sabaudo S.A.*, 71 F.2d 146 (2d Cir.1934) to not impose liability on a shipowner for breach by the ship's master and crew of the duty to rescue, was not applicable where all parties were U.S. citizens.); *In Re The Snow Maiden*, 159 F.Supp. 30, 32 (D.Mass.1958) (citing Article 3 of the Treaty to support the view that no remuneration can be awarded where the assistance has been expressly rejected).

sels of inland navigation.[6] Article 14 exempts from the Treaty's coverage ships of war and Government ships.[7] There is no contention here that either the nature of the vessels involved or the location of the operation renders the terms of the Salvage Treaty inapplicable to this case.

Article 15 makes the Treaty applicable when any of the vessels involved belongs to a country that has signed the Treaty. However, it provides that it will not apply "where all the persons interested" are from the country in which the case is being tried.[8] There is a dispute in this case as to the meaning of the phrase "all the persons interested"; plaintiffs contend that all the persons interested are from the United States while defendants contend that they are not.

The Court can find no American authority interpreting the phrase, nor was it directed to any foreign authority that has provided an interpretation. Nevertheless, the Court is confident that in this case it would be error to conclude that all the persons interested are from the United States. The phrase certainly requires consideration of the nationalities of the plaintiffs. In this case the human plaintiffs are American citizens while the corporate plaintiff is part of an entity incorporated under the laws of one of the United States.[9] The phrase must also encompass the defendants. However, plaintiffs and the defendants opposing this motion disagree as to how the phrase should be interpreted with respect to the defendants. Plaintiffs have urged the Court to treat only those defendants who have been served and have appeared before the Court as members of the class of all the persons interested.[10] The Court believes that to reinterpret "all the persons interested" as "all parties served" would be to violently restrict the scope of the Treaty. The phrase must at least encompass named defendants, and in this case two of the named defendants, Heerema Marine Contractors, S.A. and Varcos Shipping, S.A., are corporations formed under the laws of countries other than the United States.[11]

---

6. "Article 1. Assistance and salvage of seagoing vessels in danger, of any things on board, of freight and passage money, and also services of the same nature rendered to each other by seagoing vessels and vessels of inland navigation are subject to the following provisions, without any distinction being drawn between the two kinds of service and in whatever waters the services have been rendered."

7. "Article 14. This Convention does not apply to ships of war or to Government ships appropriated *exclusively to a public service.*" *See United States v. The James L. Richards,* 179 F.2d 530, 533 (1st Cir.1950) (applying the two-year limitations period in Article 10 of the Treaty to bar a suit where assistance was rendered by a British government ship to a private American vessel).

8. "Article 15. The provisions of this Convention shall be applied as regards all persons interested when either the assisting or salving vessel or the vessel assisted or salved belongs to one of the Contracting States, and in any other cases for which the national laws provide.
   Provided always, that:
   1. As regards persons interested who belong to a non-Contracting State the application of said provisions may be made subject by each of the Contracting States to the condition of reciprocity.

2. Where *all the persons interested* belong to the same State as the court trying the case, the provisions of the national law and not of the Convention are applicable.
   3. Without prejudice to any wider provisions of any national laws, Article 11 [requiring masters of every ship to render assistance to any ship in danger of being lost] only applies as between vessels belonging to the states of the High Contracting Parties."
   (Emphasis added in proviso 2.)

9. Suit was first filed in this Court by Westar Marine Services ("Westar"), and the crew of the *Polaris.* Westar asserts that it is the bareboat charterer and owner *pro hac vice* of the *Polaris.* Westar is a division of a California corporation, Cross Link, Inc. Both members of the *Polaris* crew reside in California.

10. Even if the plaintiffs' narrow concept of "all persons interested" were adopted, the Treaty would still be applicable; for plaintiff-in-intervention, Robert Atthowe (who is claiming a right in the salvage award as owner of the *Polaris* ) has served defendant Heerema Engineering Service, B.V., a foreign corporation, in his state court suit which has been removed to this Court and related to this case.

11. An analogous issue to that raised here is faced by federal courts attempting to determine

There is no inequity to the plaintiffs in interpreting the Treaty so that it is invoked when a named defendant is from a different country. As the masters of their complaint, plaintiffs can avoid naming foreign defendants in order to elude the Treaty's reach.[12] *Cf.* 13B C. Wright, A. Miller & E. Cooper, *supra* note 11, at 413–14 (a plaintiff may have an action dismissed as to a non-indispensable party to avoid diversity and preserve jurisdiction); *Ross v. Int'l Bhd. of Elec. Workers,* 634 F.2d 453, 456 (9th Cir.1980).

■ More importantly, interpreting the phrase so as to favor liberal application of the Treaty by considering the nationality of. named defendants even though they have not appeared, is consistent with the Treaty's intent to provide uniformity among nations in the resolution of salvage cases.[13] Such an interpretation also comports with the ordinary meaning of the phrase "all the persons interested" better than would an interpretation limiting its meaning to include only those persons who have been served and have appeared. In light of the intent of the Treaty and the peculiarity of the interpretation plaintiffs have urged upon the Court, the Court will interpret the phrase "all the persons interested" to include all named defendants.[14]

whether there is diversity of citizenship so as to create subject matter jurisdiction under 28 U.S.C. § 1332 (1982). In such cases the court must look to the named defendants and can ignore them only if they are nominal or formal parties. *Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 463, 100 S.Ct. 1779, 1782, 64 L.Ed.2d 425 (1980); *see* 13B C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3606 at 409 (1984).

**12.** Of course, the plaintiffs would be ill-advised to seek to avoid the Treaty by failing to join important parties, for to do so is to risk dismissal under Rule 19 of the Federal Rules of Civil Procedure. *Cf. Clinton v. Int'l Org. of Masters, Mates & Pilots of Am., Inc.,* 254 F.2d 370, 372 (9th Cir.1958) ("Diversity jurisdiction may not be artificially created by failing to join parties indispensable to the action and claiming instead against a citizen of a different state who is merely a possible party to the action."); 13B C. Wright, A. Miller, & E. Cooper, *supra* note 11, at 412. The Court expresses no opinion as to which, if any, of the defendants named in this case might be indispensable.

Thus, this Court is convinced that the Salvage Treaty governs the resolution of this issue. The question remains as to what factors can be considered in making salvage awards under the Treaty.

## III. THE CONSIDERATIONS IN A SALVAGE AWARD

The factors to be considered in making a salvage award are enumerated in Article 8 of the Treaty. It reads:

> The remuneration is fixed by the court, according to the circumstances of each case, on the basis of the following considerations: (a) Firstly, the measure of success obtained, the efforts and deserts of the salvors, the danger run by the salved vessel, by her passengers, crew and cargo, by the salvors, and by the salving vessel, the time expended, the expenses incurred and losses suffered, and the risks of liability and other risks run by the salvors, and also the value of of the property exposed to such risks, due regard being had to the special apropriation (if any) of the salvor's vessel for salvage purposes; (b) second, the value of the property salved.

Salvage Treaty, Art. 8.

**13.** The preamble to the Treaty indicates the intent to create uniform salvage law. That intent is also apparent from the history of the organization that formulated the Treaty. The Treaty is a product of the Comite Maritime International, an organization dedicated to unification whose existence represents a desire at the beginning of the 20th Century to revive the uniformity in maritime laws which had dominated the globe prior to the rise of nationalism. Paulsen, *An Historical Overview of the Development of Uniformity in International Maritime Law,* 57 Tul.L.Rev. 1065 (1983); *see also* Yiannopoulos, *The Unification of Private Maritime Law by International Conventions,* 35 Law & Contemp. Probs. 370 (1965).

**14.** "A treaty shall be interpreted in good faith and in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." Vienna Convention on the Law of Treaties, Art. 31, *quoted in* I. Brownlie, *Principles of Public International Law* 624 (3d ed. 1979).

The Treaty places an upper limit on the salvage award at the value of the property salved.[15]

#### A. Limits on the Factors to be Considered

Plaintiffs urge this Court to include within these categories of salvage award considerations both "the public interest" and the value to defendants in being spared from liability to third parties such as the owners and users of the Richmond-San Rafael Bridge (a concept sometimes referred to as "liability salvage").[16] No American Court has yet determined whether so-called liability salvage is a permissable consideration in making a salvage award under the Treaty or any other body of salvage doctrine. This Court feels compelled to conclude that it cannot be considered in this case as it is not within the contemplation of the Treaty. The Court is also compelled to exclude consideration of the public interest as a distinct factor in making the award.

Plaintiffs argue that the Court can interpret the Treaty so as to take into consideration the prevention of liability to defendants under both parts (b) of Article 8 as an aspect of the value of the property salved and under several of the other factors to which part (a) directs consideration. The Court disagrees: neither liability salvage nor the public interest may be considered as distinct factors under either part of Article 8.

#### 1. Delimiting "the value of the property salved."

Plaintiffs cite *United States v. Cornell Steamboat Co.*, 202 U.S. 184, 26 S.Ct. 648, 50 L.Ed. 987 (1906), for the authority that liability to third parties can be considered an aspect of the value of the property salved. The Court notes that the case is not an interpretation of the Treaty and so is of limited relevance to this discussion, and the Court doubts that the *Cornell* case can be taken for such a broad proposition. In *Cornell*, a ship delivering sugar caught fire in New York harbor. The salvor saved the sacks of sugar, and then collected a salvage award from the U.S. Government on the theory that because the duty on the sugar had already been paid to the Government, saving the sugar spared the Government from having to refund the duty which would not have been owed had the sugar not been unloaded. *Id.* at 192, 25 S.Ct. at 650.

This Court does not read *Cornell* for the proposition that any liability to a third party that a salvor prevents must be considered an aspect of the property salved. General salvage law and the Treaty recognize that freight and passenger money can be a subject of salvage and are therefore includable within the value of the property salved.[17] The liability for repaying the duty paid in *Cornell* is very much like the liability for repaying prepaid freight which the salvage law recognizes. Both are for a finite and predetermined amount closely related to the value of the tangible cargo on board the ship. Neither liability is as speculative or contingent as the possible liability to someone like the bridge owner would

---

**15.** "Article 2. Every act of assistance or salvage which has had a useful result gives a right to equitable remuneration.

  No remuneration is due if the services rendered have no beneficial result.

  In no case shall the sum to be paid exceed the value of the property salved."

**16.** "This arresting, if rather misleading, phrase was shorthand for a novel idea which amounted to the following: that salvors, in addition to being remunerated out of the salved property fund for services to ship and cargo, should also be entitled to receive additional remuneration for relieving shipowners (and cargo interests) from liability to third parties which they might otherwise have incurred but for the salvors' efforts."

O'May, *Lloyd's Form and the Montreal Convention*, 57 Tul.L.Rev. 1412, 1423 (1983).

**17.** Article 1 of the Treaty; *supra* note 6. "Freight" refers not to the goods carried but to the compensation which the carrier receives for carrying the goods. C. Black & G. Gilmore, *The Law of Admiralty* 245 (1975). Norris explains that "prepaid freight can be considered in the valuations of the property saved. The reason advanced for this proposition was that the prepaid freight would have to be paid back to the shippers as unearned if the cargo were lost." 3A M. Norris, *Benedict on Admiralty* § 37, at 3—10 (7th ed. 1984).

be in this case. Thus, *Cornell* at most stands for a slight extension of the concept of salvable property in federal maritime common law to include prepaid duty. Moreover, it is not clear that even such a limited extension is the law under the Treaty. The Treaty was drafted after *Cornell* was decided, but no mention is made of prepaid duty either in Article 1 in the description of what can be salved, or in Article 8 describing the factors to be considered in making the salvage award.

Recent proposals to modify the Treaty by international agreement persuade this Court that the present Treaty does not include potential liability to third persons within the concept of the value of the property salved as used in Articles 2 and 8 of the Treaty. In light of recent maritime disasters in which supertankers have become disabled and threatened coastlines with ecological disaster, the Treaty has been criticized for its inability to appropriately encourage salvors to render aid and prevent an ecological disaster.[18] The shortcoming critics found in the Treaty is its requirement in Article 2 that a "useful result" be obtained in order for a salvor to even be eligible for a salvage award.[19] The language of Article 2 codifies the "no cure,

no pay" rule which is an ancient and fundamental aspect of the law of salvage.[20] The problems critics found with the "no cure, no pay" rule was that salvors were provided with little or no incentive to prevent an oil spill when it was unlikely that the ship itself could be saved,[21] or when the value of the saved ship would be too small in relation to the efforts the salvors would undertake to prevent the spill. In short, the problem was that "useful result" was equated with arrived salved value (in this case, the value of the flotilla when it arrived at Mooring 5). When the arrived salved value was small (no cure), there could be no award at all (no pay) or the limit on the award would be so small as to make salvage efforts unprofitable.[22]

To solve the problem the proponents of the Montreal Draft International Convention on Salvage ("Draft Convention")[23] created in salvors a new duty to use their best efforts to prevent or minimize damage to the environment.[24] Those efforts may then be considered as a factor in determining the amount of the award, but the award is still subject to the limit set by the arrived salved value of the property.[25] However, the Draft Convention allows for special

**18.** For an explanation of the motivation for revisions in the Treaty, see Nielsen, Report to I.M.O. on the Draft International Convention on Salvage (Montreal 1981), (1984); Coulthard, *A New Cure for Salvors?—A Comparative Analysis of the LOF 1980 and the C.M.I. Draft Salvage Convention*, 14 J. of Mar.L. and Com. 45 (1983); O'May, *supra* note 16.

**19.** *See* Article 2 of the Treaty, *supra* note 15.

**20.** Professors Black and Gilmore suggest in their treatise that if an agreement were made whereby there would be payment even if the rescue were unsuccessful, the payment for unsuccessful services would not be for salvage, and such a contract would not be within the jurisdiction of the admiralty courts. C. Black & G. Gilmore, *supra* note 17, at 581.

A salvor may bring an admiralty suit *in rem* against a salved ship or cargo, or the suit may be brought *in personam* against the owner of such property. In either case, the existence of some property capable of ownership and transfer is presupposed. Coulthard, *supra* note 18, at 46.

The requirement that there be some tangible property when the suit is brought *in rem* is consistent with the nature of a maritime lien; the property on which such a lien is placed must be capable of being sold so as to satisfy the lien. *See* C. Black & G. Gilmore, *supra* note 17, at 35–37.

**21.** The worst-case scenario for the salvor would be the destruction of the ship after the expending of effort to save it. For example, after salvors had rendered aid to the *Torrey Canyon*, the floundering supertanker was bombed by the British government to minimize the environmental havoc it could wreak upon the English coastline. Sheen, *Conventions on Salvage*, 57 Tul.L.Rev. 1387, 1395–96 (1983).

**22.** *See* Coulthard *supra* note 18, at 50,.

**23.** Montreal Draft International Convention on Salvage, CMI Doc. 1981 Montreal 2 [hereinafter cited as Draft Convention], *reprinted in* 57 Tul.L. Rev. 1948 (1983).

**24.** Draft Convention, *supra* note 23, at Article 2–2(1).

**25.** *Id.* at Articles 3–2(1)(b), 3–2(2).

compensation when a salvor attempts to minimize damage to the environment. Whether successful or not the salvor is entitled to compensation for his expenses,[26] and if successful in minimizing damage to the environment, he may receive up to double his expenses.[27] The special compensation is only available if the salvor is not entitled to a "conventional" salvage award (which may be arrived at after considering efforts taken on behalf of the environment) as large as his special compensation might be.[28]

The perception of a problem and the Draft Convention solution indicate that the present Treaty does not include within the concept of the value of the property salved possible liability to third parties. If the Treaty did include such liability within the value of the property salved, there would have been no reason to tinker with it: a salvor who aided a damaged supertanker would have been able to come into court and argue for a salvage award up to the limit of the liability he would claim he prevented the shipowner from incurring. Clearly, the scholars who conceived the Draft Convention felt that the present Treaty does not allow the prevention of liability to be considered either as an aspect of the value of the property salved or as a cure or "useful result" as those terms are used in the Treaty.

The existence of a perceived need to revise the Treaty persuades this Court that it *cannot* consider the prevention of potential liability under the present Treaty, and the deliberations the revisers undertook con-

vinces this Court that it *should not* read liability salvage into the Treaty. The proponents of the Draft Convention explicitly considered and rejected the concept of liability salvage when they chose instead to give enhanced rewards for minimizing damage to the environment. *See* O'May, *supra* note 16, at 1423–24; Coulthard, *supra* note 18, at 50–51. This Court will not disregard the conclusions of an international body of experts without a very good reason for so doing, and the Court finds no such reason in this case.[29]

█ Thus, this Court is compelled to reject the concept of liability salvage in interpreting the Treaty. The avoidance of potential liability to third parties is not an aspect of the property salved which can be considered under Articles 2 or 8, nor does it fall within the list of salvageable items described in Article 1. So concluding, however, does not end the discussion, for there is still the question of whether or not the prevention of liability to third parties can be considered under any of the other factors described in Article 8.

2. Delimiting the other Article 8 factors.

Plaintiffs argue that two separate lines of cases, one English and one American, support their contention that preventing liability to third parties is a factor to be considered in making a salvage award.

Plaintiffs cite the English cases of *The Whippingham*,[30] 48 Ll.L.L.R. 49 (1934),

---

26. *Id.* at Article 3–3(1).

27. *Id.* at Article 3–3(2).

28. *Id.* at Article 3–3(1).

29. The acts of an international organization subsequent to the drafting of a treaty may be considered by a court interpreting that treaty. *See* I. Brownlie, *supra* note 14, at 624.

30. The *Whippingham* court said in awarding a salvage award of merely 350 pounds when a vessel valued at 3000 pounds aided *The Whippingham*, valued at 45,000 pounds which was adrift near other expensive yachts:

> The mere saving of a vessel from damage to other ships which might result in claims is a service, to my mind, because although the claim may not be a good one there is considerable damage attached to successfully defending a claim, because there is all the expense which you do not recover even when you are a successful defendant. I must think that in itself would be ground of claim for salvage.
>
> *In this case I think the claim [for a salvage award] is much better. I think this ship was rescued from receiving damage herself.*
>
> 48 Ll.L.L.R. at 52 (emphasis added).

*The Buffalo,*[31] 58 Ll.L.L.R. 302 (1937), and *The Gregerso,*[32] 1 Q.B. 274 (1973), in support of their contention that the Court should consider the prevention of harm to third parties as a factor in making the salvage award. This Court finds those cases unpersuasive. In the first place, they are not cases decided under the Treaty and thus reflect the state of British maritime law independent of the Treaty, not the law of the United States either with or without the Treaty. More importantly, they are cases in which the issue of liability is mentioned so casually as to be the most unpersuasive kind of dicta. Thus, this Court agrees with Judge Sheen who said of the three cases and their impact on English law,

> It seems to me that those dicta amount to no more than this: If the circumstances are such that, if it were not for the salvage services the shipowner might find himself liable in damages to others, that fact should have some bearing upon the amount of the salvage award because it makes the service of greater benefit to the shipowner.

**31.** In *The Buffalo* the court said (in the paragraph discussing the danger from which the defendant's crafts were saved) amidst the two pages of analysis it provided explaining its salvage award of 150 pounds when barges, which, in their damaged condition and with their cargo, were valued at 8500 pounds, were aided: "Then I think there was the question of some damage done to some other craft in the river, against which they might easily have bumped, and if they did bump up against these moored barges they might very easily have carried away." 58 Ll.L.L.R. at 365–66.

**32.** In *The Gregerso,* the court concluded that the plaintiff was not entitled to a salvage award at all for freeing a ship struck in the harbor, because the aid was not rendered voluntarily but pursuant to a preexisting duty. Apparently in an effort to avoid having to reconsider the case if remanded, the court went on to say that in case it were mistaken the salvage award would be 1200 pounds. The court said:
> In the light of this advice [that the salvaged ship might have freed itself, that the salvaged ship probably would not have sustained any damage by being stuck, that there was nothing dangerous in the salvage operation, and that the salvage tug was well handled to save the stuck ship as it did], and the value of the

Sheen, *supra* note 21, at 1405–06. The Court notes that the benefit to the shipowner is not currently one of the independent factors of which the Treaty allows consideration in making an award.

Plaintiffs rely on *Tidewater Salvage, Inc. v. Weyerhaeuser Co.,* 633 F.2d 1304 (9th Cir.1980), and cases it cites in which American courts have granted salvage awards for clearing derelicts off the seas,[33] for the proposition that the public interest is a factor in determining the amount of a salvage award. In so relying, plaintiffs have confused the rules of salvage with the policy which those rules seek to implement. *Tidewater* does contain language explaining that salvage awards are given because public policy requires that rewards be held out to encourage mariners to come to the aid of other mariners in distress, *id.* at 1306;[34] thus, the public interest is a factor motivating the existence of salvage awards in the first place. However, that is not to say that the public interest, per se, is to be a distinct factor in the calculation of each award.

The authors of the Treaty, fully aware of the purposes of salvage awards,[35] enumer-

> [stuck ship], which was agreed at 33,400 pounds, *and bearing in mind the potential liability of the defendants to third parties if the port had remained blocked,* the amount which I should have awarded, if I had thought plaintiffs entitled in principle to salvage, is 1200 pounds....

1 Q.B. at 283–84 (emphasis added).

**33.** *See The Henry R. Tilton,* 214 Fed. 165, 167 (D.Mass.1913); *The Flora Rodgers,* 152 Fed. 286, 288–89 (D.S.C.1907); *The Agnes Manning,* 59 Fed. 481, 482 (E.D.N.Y.1894); *The Anna,* 1 F.Cas. 928, 929 (E.D.N.Y.1872) (No. 398), aff'd, 1 F.Cas. 931 (C.D.N.Y.1873) (No. 401).

**34.** The *Tidewater* court cited, *inter alia, The Blackwall,* 77 U.S. 1, 14, 19 L.Ed. 870 (1869) ("Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation.").

**35.** The salvage award must be neither too big nor too small. It cannot be so big as to discourage shipowners and masters from seeking salvage assistance or so big as to encourage unnec-

ated the factors to be considered in making a salvage award so as to accomplish those purposes and serve the public interest. In so doing they precluded, and obviated the need for, the consideration of the public interest as a distinct factor in the making of each subsequent award under the Treaty.

It is not for this Court to arrogate itself to the position of an international law-making body and read additional factors for consideration into the Treaty.[36] Thus, this Court declines to consider the prevention of liability to third parties, the public interest, or "benefits to the shipowner" as distinct factors in arriving at a salvage award under the Treaty.

### B. *Clarifying the Factors to be Considered*

Within its own terms the Treaty requires this Court to consider some factors closely resembling those plaintiffs would have the Court consider under the labels of the prevention of liability to third parties or the public interest. Article 8 instructs the Court to consider, *inter alia*, "the danger run by the salved vessel, by her passengers, crew and cargo, by the salvors, and by the salving vessel." Article 8 also invites the consideration of "the risks of liability and other risks run by the salvors."

■ In assessing the danger to which the vessels, crew and cargo were exposed, the presence of the bridge can be considered.[37] However, it is the danger to the vessel from the bridge, not the danger to the bridge from the vessel, that is relevant.

Thus, while expert testimony on the likely effect a collision with the bridge would have had on the barges and rig may be admissible, testimony as to the effect such a collision would have had on the bridge would not be germane.

■ The Court also declines to allow consideration of the danger of lawsuits by third parties who might have been injured absent the salvors' assistance (such as the bridge owner or shipping lane users) under the rubric of danger to the vessel, crew, and cargo. It is a well-founded principle of salvage doctrine that "the 'peril which can be properly considered in determining a salvage award is not to be estimated in the light of subsequent or contingent events, but of the facts which surround the salvage service at the time it is rendered.'" *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 340 (2d Cir.1983) (quoting 3A M. Norris, *supra* note 17, § 249). The possibility of lawsuits by third parties, is an event too contingent to be considered by this Court in determining the amount of the salvage award. As Justice Story said, "Salvage is a compensation for the rescue of the property from present, pressing, impending perils; and not for the rescue of it from possible future perils. . . . It is allowed because the property is saved; not, because it might have been otherwise lost upon future contingencies." *The Emulous*, F.Cas. 4480 (C.C.Mass.1832). There is no indication that the Treaty has been or should be treated any differently so as to expand the concept of danger to include the danger of potential lawsuits.[38] Thus, just as the Court would not consider evidence that, for example, the vessels were saved

---

essary service; nor can it be so small as to fail to induce salvors to render needed assistance. 3A M. Norris, *supra* note 17, § 241 at 20—8, 20—9.

**36.** *See* Brierly, The Law of Nations 340 (6th ed. 1963) ("Law by its very nature is a conservative force. This bias, too, ought to be stronger in international than it is in municipal law, for whereas the latter has to adjust to ever-shifting demands and interests of millions of people jostling one another in close and continuous relations, the states with which international law is concerned are few in number, and their needs are more stable and so do not constantly call for fresh adjustments.").

**37.** 3A M. Norris, *supra* note 17, § 255 at 21—13, 21—14 (dangers from which the saving of a ship can lead to salvage awards include the danger of a drifting ship striking an obstruction).

**38.** Defendants present an affidavit from Jean Warot, Honorary President of the French Maritime Law Association and Vice President of the Comite Maritime International, in which he states both that no case in France has included hypothetical risks in the calculation of a salvage award, and that there is no basis in the Treaty for allowing the consideration of the hypothetical value of avoided third-party liability. Defendants' Exhibit H, Decl. of Jean Warot, at 6.

from a storm that occurred a week after the salvage operation if admission of such evidence were sought, so the Court will not consider evidence about lawsuits that might have been filed but for the salvor's assistance.[39] To conclude otherwise would be to tamper with an international agreement for no good reason.

██ Article 8 of the Treaty allows consideration of "the risks of liability and other risks run by the salvors." Plaintiffs correctly point out that a salvor may be liable for damage inflicted by property in their care, 3A M. Norris, *supra* note 17 § 120, and argue that "[h]ad plaintiffs been unsuccessful in their attempts to save the flotilla and had it crashed into the bridge, they would undoubtedly have been named as defendants in actions for the damage that resulted." Plaintiffs' Memo. at 11. The Court considers the likelihood of being named in a lawsuit irrelevant in the consideration of a salvage award; the Treaty speaks of liability, not vulnerability to suit.[40] The Court has serious doubts as to whether the plaintiffs would have any liability simply for failing to bring the flotilla under control. Liability would have to be based on negligence evidenced by the lack

of ordinary skill in the salvage attempt, 3A M. Norris, *supra* note 17, § 122, and mere failure does not necessarily constitute negligence.

However, the salvor certainly ran some risk of liability in the endeavor. In order to consider those risks, the Court would entertain evidence as to what the perception of risk was to the plaintiffs before and during the salvage operation. In adopting an analysis of the risk of liability that is subjective and from the prospective perspective of the plaintiffs, the Court is being faithful to the underlying purpose of considering the risk to the salvor at all. That purpose is to encourage rescues even in the face of danger by enhancing the award when such danger is present. *See* 3A M. Norris, *supra* note 17, §§ 264–66; C. Black & G. Gilmore, *supra* note 17, at 562. Thus, after-the-fact testimony as to what the damage to the bridge might have been had the flotilla not grounded is irrelevant to the Court's assessment of the risk of liability run by the salvors.

## IV. CONCLUSION

While it has been cynically suggested that reciting the many factors to be con-

Plaintiffs counter with the after-dinner address of the President of the Comite Maritime International in which he says only that cases have held that the avoidance of third-party liability is a "cure" for purposes of the Treaty. ("It could perhaps be held, and it has so been held in some cases, that the avoidance of a responsibility to the owner is by itself a 'resultat utile' (useful result) for the purposes of Art. 2 of the 1910 Convention. However, even on the assumption that this provision can be so construed, the incentive would exist only in cases of actual responsibility of the owner and not where such responsibility does not exist." Berlingieri, Salvage: From the 1910 Brussels Convention to the 1981 Montreal Draft (Dinner Address) in *Marine Salvage, Proceedings of the Third International Symposium* 132, 133 (1985)). This Court does not find in Mr. Berlingeri's statement any indication that the Treaty allows consideration of potential lawsuits under the rubric of dangers run by the parties and property involved.

**39.** The Court acknowledges that it is engaging in linedrawing when it limits the concept of "danger" so as to preclude consideration of potential lawsuits, for losing property to a successful

plaintiff is as real a loss as losing property on a rocky shoal. However, limiting the considerations allowed under the danger rubric would not prevent the Court in this case from satisfying the policy of awarding a sufficient reward to encourage needed salvage. To allow consideration of potential liability would require the Court to hear testimony regarding potential damage to third parties, the propensity of those third parties to sue, and the likelihood of success if such third parties did sue. Allocating judicial resources to such an endeavor seems ill-advised when a fair salvage award can be allowed based on consideration of the other factors the Treaty clearly allows.

**40.** But cf. Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 549 F.Supp. 540, 559 (S.D.Fla.1982). Applying federal maritime common law, not the Treaty, the *Cobb Coin* court held that where salvors were actually arrested at one point during the operation, the threat of arrest may be considered as one element of the risk to salvors in calculating the award. Where, as in the instant case, the lawsuits are entirely speculative, the Court will not consider them part of the danger run by the salvors.

sidered in making a salvage award merely "serves the useful purpose of indicating that the variables are so many and so incapable of exact measurement that it will probably be fruitless for either party to take an appeal merely on the ground that the award was incorrectly computed," C. Black & G. Gilmore, *supra* note 17, at 559, the Court believes that clarifying some aspects of these factors is important so that the parties can better evaluate their cases.

In rejecting the consideration of the prevention of liability to third parties and the public interest as independent factors, the Court is not only faithfully interpreting the Treaty as it is now written, but is maintaining a position on the issues which is consistent with that taken by the reformers of the Treaty.

However, having clarified the factors that will be considered in making the salvage award, the Court notes that it is still left with considerable discretion in how those factors are to be weighed [41] so that a fair salvage award that will serve the interests of the parties and the public can be awarded.

IT IS SO ORDERED.

---

**41.** No priority was set in the Treaty, and the Draft Convention makes clear that the factors it outlines are not to be weighted by the order they are presented. Draft Convention, *supra* note 23, at Article 3–2(1).