Ole **HENDRICKS, Larry Hendricks, and Robert Resoff, partners and owners of the F/V SEA STAR, individually, and as representatives for the crew of the F/V SEA STAR, consisting of Larry Hendricks, Kenneth Hendricks, Joe McIntosh, Kerry Noble, Tod Drake, Bill Boles, Tom Payne, and Dwight Nelson, Plaintiffs,**

v.

The **TUG GORDON GILL, its tackle, engines, apparel, etc., in rem; and Arctic Offshore, Ltd., a Canadian corporation, in personam, Defendants.**

No. A87–313 CIV.

United States District Court,
D. Alaska.

Jan. 12, 1989.

Richard J. Smith and William Wuestenfeld, Camarot, Sandberg & Smith, Anchorage, Alaska, Douglas M. Fryer and Jeffrey L. Jernegan, Mikkelborg, Broz, Wells, Fryer & Yates, Seattle, Wash., for plaintiffs.

Dale W. House, Lane, Powell & Barker, Anchorage, Alaska, Richard A. Nielsen, Jr., Lane, Powell, Moss & Miller, Seattle, Wash., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KLEINFELD, District Judge.

Trial of this case was to the court. After trial, the parties submitted briefs and reply briefs. Based upon the evidence at trial, I find the following:

(1) The named plaintiffs owned and manned the fishing vessel Sea Star. The defendant and claimant Arctic Offshore, Ltd. is a Canadian corporation, which owns and owned the Tug Gordon Gill.

(2) At around 2:00 in the morning, February 25, 1987, the Sea Star found the Gordon Gill adrift. The Sea Star was about seven miles east of Egg Island, a tiny island in the Aleutian Chain. The Sea Star was in the process of setting strings of test pots in its fishing operation when it found a blip on the radar. The initial reaction of Captain Larry Hendricks of the Sea Star was that the blip might be a dragger, that is a fishing vessel dragging a net, which might endanger the Sea Star's string of pots, since the vessel's lights were off and it did not respond to a distress call, so Captain Hendricks set out on a chase.

(3) He found the Gordon Gill floating in the sea with boarded up windows and no one on board. The Gordon Gill was floating about seven miles east northeast of Egg Island. Temperature was in the 20's (above zero) so there were icing conditions. He faced 20 to 30 knot winds and 8 to 12 foot seas.

(4) Captain Hendricks contacted the Coast Guard, which advised him that the Gordon Gill had been lost several months before. He asked for advice on what to do, and the Coast Guard asked him his intentions. He said that he would put a man on board and try to get the Gordon Gill into a safe harbor.

(5) Captain Hendricks gave crewman Tom Payne his survival suit and a couple of

strobe lights, and Mr. Payne leaped from the Sea Star to the Gordon Gill. It took three tries for the Sea Star to get a good pass allowing the leap. He slid across the wet icy deck of the Gordon Gill, after picking a moment when the swells did not produce an 8 to 12 foot difference in the heights of the decks. Mr. Payne was unable to break the tow line loose on the Gordon Gill, so the vessels improvised a tow line.

(6) From 3:00 in the morning until about 10:15 in the morning, the Sea Star towed the Gordon Gill into Beaver Inlet, in order to get out of the wind and fabricate a better tow line. Beaver Inlet is a somewhat sheltered bay, but with no major towns or harbors, on the east side of Unalaska Island.

(7) After a couple of hours in Beaver Inlet working on the tow line, Captain Hendricks determined that it was important to beat the weather through the pass which would allow him to get into an established harbor with manmade facilities. A gale with 35 to 50 knot winds was coming in, and the predictable tides in the pass between Unalaska Island and Akutan Island in the opposite direction of the wind would produce impassable high seas if he was too late. Captain Hendricks reasonably thought it impractical to wait until the next day, because the gales expected to blow into the inlet might make it impossible for him to anchor both vessels. He needed to go north through the pass, from the Pacific Ocean side to the Bering Sea side, of Unalaska Island, to get to Dutch Harbor on the north side of the island, in order to have a practical place to leave the Gordon Gill.

(8) The tow line broke especially frequently as the Gordon Gill was towed through Unalga Pass because of the high seas and opposing current. Each time, Tom Payne and Joe McIntosh leaped back and forth between the wet and icy vessels, in the wind and waves, to resecure the line. When the line snapped, it posed a hazard to the Sea Star crew and equipment.

(9) The Sea Star arrived in Dutch Harbor with the Gordon Gill at about 10:00 at night on the 25th. This concluded about 20 hours of extremely difficult and hazardous work in the salvage operation.

(10) Captain Hendricks arranged with the harbor master for care of the Gordon Gill and for movement of the Gordon Gill to a protected spot for long-term storage.

(11) At about 9:00 at night on the 26th, the day following, a major earthquake, about 6.9 on the Richter Scale, shook the Aleutian area. The Sea Star pulled out of the town in order to avoid crashing into the dock if there was a tsunami, the kind of tidal wave caused by earthquakes in this region, and further secured the Gordon Gill with its own lines at the dock. The following day and evening, the 27th, the Gordon Gill was moved to a long-term storage dock, the crew of the Sea Star pumped out the bilge of the Gordon Gill and examined it to be sure that it would not sink. On March 1, the Sea Star left Dutch Harbor to resume fishing.

(12) If the Sea Star had not taken the Gordon Gill in tow, it would in all likelihood have run aground on one of the nearby islands and been destroyed. There was a shipwreck, observed by Joe McIntosh on the beach in Unalga Pass, near where the Gordon Gill was first spotted.

(13) The Sea Star was purchased for $375,000 in 1975, but by the time of the salvage operation, had a replacement cost of $1,900,000. Its fair market value was about $1,250,000.

(14) The salvage was higher order salvage. The Gordon Gill was rescued from great peril at considerable risk to the salvors. The promptness, skill and energy with which the salvors acted was great, and resulted in the safe return of a vessel which had been floating derelict for four months. The means of rescue, though hazardous and difficult, were reasonable in the circumstances. In the very challenging part of the world in which the salvage took place, the Gordon Gill could not have been salvaged at all if the Sea Star had not engaged in the risky and aggressive methods it used.

 The Sea Star incurred expense for three days of labor, reasonably chargeable

to the salvage. The Gordon Gill would like the salvage labor to include only the hours necessary to reach Beaver Inlet, but that was not a practical safe harbor at which to leave the Gordon Gill. Part of the four and a half day interruption of fishing is reasonably attributable to the earthquake rather than the salvage operation, and part appears to have been time spent other than on necessary work on the salvage at Dutch Harbor. The cost of labor was the net lost fishing profits, and it is reasonable to use the average figure of $3,581 applicable to the period from September 6, 1986, to December 14, 1987, rather than the springtime average preferred by the defendants, because the conditions are more similar, so three days amounts to $10,743. Other uncontested expenses in the salvage amounted to $13,266.72. The pots lost in the earthquake ought to be charged to the salvage, because they most likely would have been picked up before the earthquake, had the Sea Star not been diverted from fishing by the need to salvage the Gordon Gill. The 83 lost pots at $139.94 amount to a loss of $11,565. The groundline was lost and cost $2,240. Damage to the winch required repairs, involving loss of fishing income, fuel for repeated trips to Dutch Harbor, layover in Dutch Harbor, and winch parts and labor, for a total of $13,-117. Thus the total salvage, labor and expenses amounted to $50,931.72.

(15) The Gordon Gill is an unusual vessel built for a special purpose, and is now commercially but not physically obsolete. It was built in 1982 for oil and gas exploration in the Beaufort Sea, at a cost of approximately $2,200,000 Canadian. Arctic Offshore had negotiated a charter rate with an oil company on a multi-year contract, and paid about $2,200,000 to build at the vessel at the Hay River, about $1,000,-000 more than it would have cost to build the vessel in Vancouver, so that it could be sailed down the Mackenzie River to get some use out of it during the 1982 season. The vessel was built to have a 15 or 20 year life expectancy. Unfortunately for Arctic Offshore, the severe drop in the price of oil during the 1980's destroyed the opportunity to charter it at high rates to the oil

companies, and 1984 was the last season in which it was fully occupied. The vessel got a little work in the summer of 1985 and 1986 but not much, so in 1986, Captain Tetrault of Arctic Offshore decided to move the vessel out of the Beaufort Sea to the east coast of Canada in order to find an eastern Canadian port in which it could operate profitably. The ice conditions were too severe in the northwest passage, so the vessel was towed west past Barrow, in an attempt to reach the Panama Canal. The tow began October 7, 1986, and Captain Tetrault discovered that the Gordon Gill was no longer in tow October 22, 1986.

(16) The vessel was insured in July of 1987 for $750,000, after the liens had been released. Captain Tetrault says that he had no input into that figure, because it was arrived at between his lawyers, the underwriters and their lawyers, but his lawyers were acting as his agents, and the figure appears to be reasonably related to the value of the vessel. When the vessel was lost, Arctic Offshore spent more than $300,000 trying to find it and repairing the Orion Expeditor, with which the search was made.

(17) The most difficult aspect of the case is determination of the value of the Gordon Gill. Arctic Offshore has repeatedly requested that the Gordon Gill be sold where is, as is, with that figure used as its value for purposes of the salvage. That would not be a good measure, because a Marshal's sale in Dutch Harbor would likely produce a result well below what the vessel would bring in a more commercially reasonable setting between a willing but not necessitous buyer and a willing but not necessitous seller. Marshal's sales ordinarily do bring in a low value, and the problem would be exacerbated in this case because of the remote location of the vessel. Any prospective buyer must weigh the cost of his shopping trip and the risk of being outbid or of discovering that the vessel will not suit his needs, against the possibility of buying a desirable vessel at a good price. Many prospective buyers would therefore be less willing to make a shopping trip to Unalaska, than, say, New York Harbor or

San Francisco Bay. Efforts to sell the vessel where is, as is for $500,000 to $600,000 have failed, but bids have come in for $300,000 Canadian, $300,000 U.S. and $400,000 Canadian as is where is, even though the market is very poor at this time because the price of oil is so low. The vessel can be used as a tug in many circumstances, but is not as well suited as other tugs for many applications. It has ice capability, but not open seas capability. It would cost about $140,000 to $150,000 to repair the vessel and get her resurveyed and properly put in her class. Although the vessel was insured for $1,500,000, I do not think that is evidence of its current value, but rather of the need to insure it against the mortgages on it.

(18) Based on all the evidence, I find that the vessel is worth at least $300,000 as is where is, and approximately $750,000 if sold in a commercially reasonable manner from a more accessible port. Based on Captain Tetrault's estimate of $240,000 to tow the vessel from the Beaufort Sea west past Barrow, south through the Aleutians and the Pacific, through the Panama Canal, and then north to Nova Scotia, I find that the Gordon Gill could be towed into a port where it could be marketed effectively for no more than an additional $80,000. Thus I find that the net value of the Gordon Gill is $750,000, less the $150,000 repair cost, and less the $80,000 tow cost, for a net value of $520,000. I think this is the most practical evaluation of what the vessel is worth. A buyer from, say, San Francisco would offer no more for the vessel than its value to him in San Francisco less the cost of getting it there.

(19) The salvage award is governed in this case by the Convention for the Unification of Certain Rules of Law Relating to Assistance and Salvage at Sea, September 23, 1910, 37 Stat. 1658 (1913) called the "Salvage Treaty," reprinted in 3A M. Norris Benedict on Admiralty, Appendix B1 (7th Ed.1984). Both the United States and Canada are signatories, and the treaty applies where any of the vessels involved in a salvage operation belong to a signatory country and not all persons interested are from the country in which the case is being tried. Salvage Treaty, Article 15.

■ (20) The elements of a salvage claim are as follows: (1) a maritime peril from which the ship could not have been rescued without the salvor's assistance; (2) a voluntary act of salvage by the salvor; and (3) the salvor's act was successful in saving at least a part of the property at risk. *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1104 (9th Cir.1985), *citing* G. Gilmore and C. Black, *The Law of Admiralty* sec. 8–2, at 534–35 (2d ed. 1975).

■ (21) The following factors are to be considered in assessing a salvage award: (1) the measure of success obtained; the efforts and deserts of the salvors; the danger run by the salved vessel; the danger run by the salvors and the salving vessel; the time expended by the salving vessel; the expenses incurred and losses suffered by the salving vessel; the risks run by the salvors and the value of the property subjected to such risk; and (2) the value of the property salved. Salvage Treaty, Article 8. *See also U.S. Dominator,* 768 F.2d at 1105, *quoting The Blackwall,* 77 U.S. (10 Wall.) 1, 13–14, 19 L.Ed. 870 (1869). In addition, the amount of the salvage award may not exceed the value of the property salved. Salvage Treaty, Article 2.

■ (22) The peril to the Gordon Gill was great, the salvage was entirely voluntary, and the salvage was entirely successful. The danger to the Sea Star was great, its value was as stated above, and the risks to the crew of the Sea Star were very great. The value of the Gordon Gill, which is the property salved, was as stated above.

(23) Considering all these factors, I find that the appropriate salvage award is $224,265. This figure of $224,265 includes the expenses as well as the salvage award, and is to be divided between the owners and the crew of the Sea Star in accord with their agreement among themselves. My conclusion is that about one third of the value of the vessel, plus the $50,931.72 expenses, is appropriate.

**1104**

(24) The Sea Star contends that it should be awarded liability salvage as well, for the value to Arctic Offshore in avoiding liability to third persons for removal of the wreck of the Gordon Gill or clean up of oil spillage from her fuel tanks. Such an award cannot be made, under the terms of the salvage treaty and the Convention for the Unification of Certain Rules of Law Relating to Assistance and Salvage at Sea, called the Brussels Convention of 1910. *Westar Marine Services v. Heerema Marine Contractors,* 621 F.Supp. 1135 (N.D. Cal.1985).

Plaintiffs shall lodge a proposed judgment within ten days.